**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

**Chapter 11**

**IPS WORLDWIDE, LLC,**
**Case No. 6:19-bk-00511-KSJ**

      **Debtor.**
_____/

**ALEX D. MOGLIA, TRUSTEE,**

      **Plaintiff,**

**vs.**
**Adv. Pro. No. _____-KSJ**

**BANK OF AMERICA, N.A.**

      **Defendants.**
_____/

**ADVERSARY COMPLAINT FOR AIDING AND**
**ABETTING BREACH OF FIDUCIARY DUTY**

**JURY TRIAL DEMANDED**

The Plaintiff, ALEX D. MOGLIA, in his capacity as the liquidating trustee (the "**Trustee**" or "**Plaintiff**") for the IPS Liquidating Trust, as the successor to IPS Worldwide, LLC and its bankruptcy estate (the "**Debtor**" or "**IPS**"), by and through undersigned counsel, files this Adversary Complaint for Aiding and Abetting Breach of Fiduciary Duty against Bank of America, N.A. ("**BOA**" or the "**Defendant**").

**THE PARTIES, JURISDICTION & VENUE**

1.      On January 25, 2019, (the "**Petition Date**") the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. [ECF No. 1][1].

---

[1] All citations to ECF filings herein are made to the Main Case, *In re IPS Worldwide, Debtor*, Case No. 6:19-bk-00511-KSJ.

2.     On April 5, 2019, this Court entered an order for the appointment of a Chapter 11 Trustee, resulting in the appointment of the Trustee herein.  [ECF Nos. 290, 291].

3.     On December 16, 2019, the Trustee filed his *Amended Disclosure Statement Pursuant to 11 U.S.C. § 1125* (the "**Disclosure Statement**") [ECF No. 588]; and (ii) *Amended Plan of Liquidation* (the "**Plan**") [ECF No. 589], which Plan was confirmed by the Bankruptcy Court pursuant to its *Order Approving Amended Disclosure Statement and Confirming Amended Plan of Liquidation for IPS Worldwide, LLC* [ECF No. 642] entered on February 7, 2020 (the "**Confirmation Order**").

4.     Pursuant to the terms of the Plan and the Confirmation Order, the IPS Liquidating Trust was created, into which all property of the Debtor and the Debtor's bankruptcy estate was vested.  The Trustee was appointed as the Liquidating Trustee of the IPS Liquidating Trust, and was vested with all of the rights and powers of a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, including the right to investigate, commence and/or prosecute any and all claims and causes of action that exist or may exist in favor of the Debtor and the Debtor's bankruptcy estate against any person or entity under any applicable state law, federal law and/or bankruptcy law, whether statutory and/or common law, including, without limitation, to recover transfers of monies or property under Chapter 5 of the Bankruptcy Code.

5.     Defendant BOA is incorporated under the laws of the State of Delaware with business and mailing addresses reported to the United States Securities and Exchange Commission in Chicago, IL and a reported headquarters in North Carolina.  At all times relevant herein, Defendant provided banking and financial services in the Middle District of Florida and elsewhere to the Debtor, certain affiliates and insiders of the Debtor, including, at least, William Davies ("**Davies**") and  Michael McNett ("**McNett**").

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

7.     This is a core proceeding pursuant to 28 U.S.C. §157(b) (2) (A), (H), and (O).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

9.     All conditions precedent to the filing of this action have been performed, waived, satisfied, or have otherwise occurred.

### Facts Supporting the Claims

10.     Debtor (f/k/a Interlog Services, L.C.) is a Florida limited liability company formed on or about June 25, 1998.  Prior to the appointment of the Trustee, the Debtor was managed by Davies.  At inception, Debtor had four (4) managers: Davies; Douglas Cook ("**Cook**"); McNett and LJ McNett ("**LJ McNett**").  At all times relevant herein, Davies, Cook, McNett and LJ McNett each owed a fiduciary duty to Debtor by virtue of each's status as an actual and/or *de facto* manager, officer and/or director of Debtor. As of the Petition date, Debtor was a wholly owned subsidiary of DACACO, a Florida limited liability company formed on or about April 30, 2003 by Davies, Cook and Charles Casey ("**Casey**"), among others. Davies, Cook, McNett, LJ McNett, and Casey were at all relevant times direct or indirect holders of equity interests in the Debtor. They are collectively referred to herein as the "**Insiders**."

11.     At all times relevant, accountancy firms Martin, Klayer and Associates, P.A. and Klayer and Associates, Inc. provided professional services to Debtor.  In all instances, the primary, although not exclusive, point of contact with these accountancy professionals was Garrett Klayer ("**Klayer**").[2]

---

[2] According to Florida's Division of Corporations' public records, Martin, Klayer and Associates, P.A.'s evolution as an entity began on June 2, 2003 when the former Marteo & Associates, PL was renamed to Martin & Associates, PL. On December 22, 2011 Martin & Associates, P.L., formally changed its name of its limited liability company to Martin Klayer Associates, PL, effective January 1, 2012.  On March 1, 2012 Martin Klayer Associates, PL formally changed

12.      At all times relevant, Cobb & Cole, P.A. ("**Cobb Cole**") was a Florida for profit corporation providing legal services in Daytona Beach and DeLand, Volusia County, Florida and served as legal counsel to the Debtor.  Cobb Cole provides legal services from these two offices and maintains its principal address at 149 S. Ridgewood Avenue, Suite 700, Daytona Beach, Florida 32114.   Cobb Cole provided professional services to the Debtor since at least in or about the year 2004.   At all times relevant herein, Cobb Cole also provided contemporaneous professional legal services to certain affiliates and insiders of the Debtor, including, at least, William Davies ("**Davies**") and Charles Casey ("**Casey**").   John Ferguson, Esq. was Debtor's primary, although not exclusive, point of contact with Cobb Cole.

13.      As of the Petition Date, the Debtor owed its creditors well in excess of $81,000,000.

14.      As of the Petition Date, Davies held a sixty-seven percent (67%) ownership interest in DACACO.  McNett and LJ McNett served as Vice-Presidents of IPS, holding a twenty-two percent (22%) and eleven percent (11%) ownership interest respectively in DACACO.   As of the Petition Date, DACACO owned (i) 100% of the equity interests in IPS; and (ii) 48.5% of the equity interests in Exfreight Florida, a Florida limited liability company formed on August 31, 2015. Exfreight Zeta, Inc. owned the remainder of the equity interests of Exfreight Florida.  Exfreight Zeta, Inc. is an Ontario, Canada corporation founded by Charles Marrale and Steven T. Huntley ("**Huntley**").   At various times relevant herein, Huntley supervised or managed the Debtor's carrier contract management ("**CCM**") business from offices in Coral Springs, Broward County, Florida.  Huntley never directly or indirectly owned any equity interest in the Debtor and although

---

its name to Martin, Klayer & Associates, PL, and is also known as Martin & Associates, PL and Martin & Associates of Daytona, PLLC (collectively referred to as "**MKA**") and remains an active entity as of this writing.  From 2004 through in or about May 1, 2009, Douglas Martin ("Martin") was the sole manager of MKA.  Florida Department of Corporations Public records evidence that Klayer was added as a manager of MKA on May 1, 2009.  At all relevant times thereafter until August 2, 2017, the principals of MKA were Martin and Klayer.  On August 2, 2017, Klayer formed Klayer and Associates, Inc. ("**KA**").  Klayer's relationship with MKA was terminated effective January 1, 2018.   Thereafter, KA took over the professional services previously provided to Debtor by MKA.

he was at relevant times a statutory insider of the Debtor within the meaning of 11 U.S.C. Section 101(31), he is not included in the definition of "Insider" as used in this complaint.  Indeed, as set forth herein, no non-owner, non-Insider officer, employee, or agent of the Debtor was informed of the Insiders' embezzlement[3] as described herein.

15.     Prior to the Petition Date, Debtor's management team was led by Davies, as president and manager. Davies was responsible for managing the accounting department, electronic data interchange department, client service department, the information technology ("**IT**") department and the general administrative staff.   Supervisors for each of Debtor's departments reported directly to Davies and he personally oversaw Debtor's operations.  As of the Petition Date, McNett was Debtor's Chief Financial Officer ("**CFO**") and was intimately involved with Davies in IPS's operations at all times relevant herein.  At all times relevant herein, Davies and McNett each owed fiduciary duties to Debtor.

16.     Prior to the Petition Date and to further its business concept, IPS provided global freight payment services to its customers, including, but not limited to, freight audit ("**Freight Audit**") and payment solutions, logistics and CCM and North American and international transport management.  IPS developed an information technology system that enabled it to provide an audit function to ensure the accuracy of freight payment processing as well as process invoices for payments.  This proprietary software was scalable to fit any freight business, whether local or global.

17.     The Freight Audit service was the largest portion of IPS's business.  In providing this service, IPS entered into Freight Bill Processing Services Agreements (each a "**Services Agreement**") with its customers to review freight invoices in accordance with the terms a freight

---

[3] The terms "embezzlement" and "defalcation" as used herein include but are not limited to Insider and inter-company loans and transfers, including to the Insiders.

company had with the IPS customer.  In connection with the Freight Audit services as set forth below, IPS intended to collect service fees in accordance with the terms set forth in each of its individual customer Services Agreements.

18.     Pursuant to the terms of the Services Agreement, IPS was responsible for the following Freight Audit services and related duties and responsibilities:

   a.    ensuring that freight bills were remitted by the shippers in accordance with contractual terms;

   b.    eliminating duplicate or improper charges by shippers;

   c.    resolving disputes with shipping companies; and

   d.    making timely carrier payments to shippers in appropriate currencies using funds provided by IPS's clients.

19.     IPS should have maintained its customers' deposits[4] (the "**Customer Deposits**") in separate and segregated bank accounts, such as those at BOA, or at a minimum held them in a manner protecting those Customer Deposits. Customer Deposits were to be used exclusively by IPS for payment of each customer's respective freight and vendor invoices.  Relevant provisions of some of the Services Agreements required that the Customer Deposits be held in trust by IPS for the customer's benefit.

20.     In late 2005, IPS began offering clients CCM services, consisting in part of IPS aiding its customers in negotiating contracts with freight companies.  IPS provided this service using its employees and contractors.  Huntley oversaw and directed the CCM services for the Debtor.

21.     In connection with the operations of the Debtor, other related and/or affiliated entities were formed and/or merged into the Debtor throughout the years to create the corporate

---

[4] As used in this Complaint, the term Customer Deposits includes any refunds due to a given customer.

structure described above.   Among those entities are (i) Macrotransport Services, LLC ("**MTS**"), (ii) Sum of Ideas, LLC ("**SI**"), and (iii) DMM Services, LLC ("**DMM**") (collectively with Exfreight Florida, the "**Affiliates**").

22.     MTS was a Florida limited liability company formed on April 29, 2003.  On March 23, 2015, MTS's articles of incorporation were amended, pursuant to which Davies was appointed the sole Manager and President of MTS, and Huntley was appointed as Senior Vice President of Operations. On that same date, MTS changed its name to The Freight Rate Company, LLC ("**Freight Rate**").  By October 2017, Davies and Huntley were the only two officers of Freight Rate and remained as such through the Petition Date.

23.     SI[5] was a Florida limited liability company formed by Casey on April 30, 2003 and was merged into IPS on December 31, 2008.

24.     DMM was a Florida limited liability company formed on September 11, 2012.  The managers of DMM were Davies, McNett and LJ McNett.   Upon information and belief, DMM was used to process payroll and health benefits solely for Davies, McNett and LJ McNett as well as for Brandy Peterson ("**Ms. Peterson**") who served in an accounting capacity for Debtor. All other employees of the Debtor were considered temporary help and paid through a temporary employment agency.

## I.     APPOINTMENT OF THE EXAMINER AND THE TRUSTEE

25.     In the years leading up to the Petition Date, IPS's operations were riddled with instances of corporate mismanagement, waste and breaches of fiduciary duties owed to it by its former actual and/or *de facto* managers, officers and/or directors, including but not limited to, Davies, Cook, Casey, McNett and LJ McNett (as defined above, the "**Insiders**").  Instances of

---

[5] SI was formerly known as Sum of Ideas, L.C.

such mismanagement, waste and breaches of fiduciary duty by the Insiders are set forth below, but are not an exhaustive list of each instance.

26.     On February 8, 2019, Debtor filed its Bankruptcy Schedules and Statement of Financial Affairs originally reporting assets of $13.5 million and estimated non-priority unsecured liabilities of close to $52 million.  [ECF No. 92].   In a filing made on the next business day, the Debtor reduced its stated assets by more than eighty percent (80%) to reflect a valuation of $2,450,875.16.  [ECF No. 100 at 7].

27.     On February 14, 2019, the Bankruptcy Court directed the appointment of a Chapter 11 Examiner, resulting in the appointment of Maria M. Yip (the "**Examiner**").  In the performance of her duties, the Examiner conducted a detailed analysis of IPS's multiple bank account records at Bank of America, Regions Bank and TD Bank.  The Examiner submitted her interim reports on March 6, 2019 [ECF No. 182], April 2, 2019 [ECF No. 277] and May 10, 2019 [ECF No. 382] (the "**Examiner's Reports**").  The Examiner's analysis found substantial misuse of Customer Deposits and client funds, and commingling of those customer funds.  Importantly, the Examiner found, among other irregularities, a history of IPS's failure to segregate Customer Deposits as required, the misuse and misappropriation of client funds, suspicious or unexplained transfers of funds including in the accounts at BOA, overdrafts including in the accounts at BOA, and ongoing operating losses.  The Examiner determined, based on her review of DACACO's tax returns, that IPS had total operating losses between 2009 and 2017 of approximately $13 million.  [ECF No. 277].  Within days of the Examiner's April 2019 report, the Court directed the appointment of a chapter 11 trustee and the Trustee was appointed by the United States Trustee.   Pursuant to the terms of the Plan and the Confirmation Order, the Trustee was appointed as the Liquidating Trustee for the IPS Liquidating Trust.

## II.  **IPS's LIQUIDITY ISSUES**

28.     From inception, IPS was thinly capitalized with loans from the Insiders that were quickly repaid by IPS to the Insiders.  From that point, the practice of financial machinations increasingly worsened IPS's liquidity as funds were used to make loans to Insiders, buy out Insider interests, acquire affiliated entities, and pay professional fees. IPS's tax filings throughout evidenced that IPS was losing money and was never profitable.

29.     As time wore on, the Insiders' embezzlements and breaches of fiduciary duty precipitated a pattern and practice of continued raiding of Customer Deposits to cover overdrafts and instances of insufficient funds to cover up such embezzlements, failures and breaches of fiduciary duties (the "**Overdrafts**").

30.     BOA had, since at least 2008 and continuing through the Petition Date, actual knowledge of, or was willfully blind to, such chronic Overdrafts and actively, routinely and repeatedly assisted, enabled and facilitated the covering of such Overdrafts with and from Customer Deposits, in many instances with segregated funds.  Such actions were taken not only to fund and facilitate the above referenced embezzlements and personal benefits to the Insiders, but also to actively conceal such embezzlements and personal benefits from Debtor's Customers and from other unknowing individuals and persons in position of control or *de facto* control at Debtor and its affiliated entities, including but not limited to, Huntley.

31.     From at least 2008 through the Petition Date, BOA was the primary provider of financial services to the Debtor.  Annexed hereto Exhibit A as is a summary of Debtor or affiliated accounts at BOA at times relevant herein.  Included among these accounts is an account ending in 4157 titled as Debtor's Freight Bill Payment account (the "**Freight Bill Payment Account**"). *See*, Exhibit A at 3.  This account was regularly overdrawn and such overdrafts became a daily

occurrence in the time leading up to the Petition Date.  In addition to the Freight Bill Payment Account, several of Debtor's customers had separately named IPS accounts at BOA that included the customer name and, in certain instances, an additional explicit reference that these accounts were "FBO" the named customer.  (the "**Intended Customer FBO Accounts**").  As an example, Debtor's customer Alcoa has an FBO account ending in 0348. *See*, Exhibit A at 1.  Other Customer's similar accounts did not have the specific designation of "FBO" listed thereon, but the intention was that the Customers' Deposits would be used to pay solely that customer's vendors.[6]

32.     The initials "FBO" are commonly used in the financial and other industries to signal that the funds, assets or other thing of value is being held by one entity or individual (here Debtor) "for the benefit of" another individual or entity (here, Debtor's customer).

### III.     FREIGHT BILL PAYMENT ACCOUNT OVERDRAFT EXAMPLES

33.     At all relevant times, there were many instances of the routine Overdrafts and covering of Overdrafts from Intended Customer FBO Accounts, as well as from monies in the Freight Bill Payment Account.   Debtor had additional general accounts at BOA and other banks during all times relevant, including a Wells Fargo Operating and Payroll Account ending in 0356 and a Wells Fargo Logistics account ended in 2624.  Highlighted below are some examples of Overdrafts in the Freight Bill Payment Account that were covered by transferring money from Intended Customer FBO Accounts and that are drawn from the example summary annexed hereto as Exhibit B which is based on a review of BOA account records:

   a.   From January 7, 2015 through September 15, 2015, $2,675,000.00 was transferred **into** the Freight Bill Payment Account from the FBO Alcoa account ending in 0348. During that same time, a total of $2,505,000.00 was transferred **from** the Freight Bill Payment Account into the BOA Alcoa FBO account, leaving a shortage of $170,000.00.   A review of the timing of the transfers makes it evident that the transfers into the Freight Bill Payment Account were done merely to cover existing

---

[6] The title of an account on the deposit account records is not necessarily determinative of the existence of a fiduciary relationship for purposes of FDIC insurance.  *See* 18 CFR §3305(b).

overdrafts. For example, the account had been in an overdrawn status on at least three occasions in early January 2015. On January 23, 2015, there was a transfer from the BOA Alcoa FBO account to the Freight Bill Payment Account for $200,000.00. Three days later, the Freight Bill Payment Account was overdraw again and on January 28, $2,000,000.00 was transferred into the Freight Bill Payment Account from the BOA Alcoa FBO account. The following day, January 29, 2015, the total of $2.2 million dollars was transferred back into the BOA Alcoa FBO account.

b.  A similar pattern is evidenced in the Freight Bill Payment Account record during the time between March 1, 2016 through December 27, 2016. During this time, there were transfers into the Freight Bill Payment Account from the BOA Alcoa FBO account and then into and out of the Freight Bill Payment Account within a day to cover overdrafts in the Freight Bill Payment Account. By then, however, funds began to be transferred into the Freight Bill Payment Account from other accounts, including another Alcoa account ending in 7720. Again, however, that transfer on December 13, 2016 to cover an overdraft in the Freight Bill Payment Account was transferred back into the Alcoa 7720 account the following day. In addition, the transfers to cover overdrafts extended to other customers, including an FBO account for Debtor's customer Mueller in the BOA Mueller FBO account ended in 7431. As before, the funds (in that particular case, $600,000.00) were transferred into the Freight Bill Payment Account on December 13, 2016 to cover an overdraft and then back to the BOA Mueller FBO account the next day. These three back and forth transfers to cover the Freight Bill Payment Account overdrafts totaled $1,300,000.00.

c.  By 2017, the back and forth transfers had expanded even further both in scope, source and total. A total of $5,375,000.00 was transferred into the Freight Bill Payment Account from Intended Customer FBO accounts from January 9, 2017 through December 29, 2017. As in prior years, a review of the transfers into and out of the Freight Bill Payment Account demonstrates that they were made to cover Overdrafts in the Freight Bill Payment Account. The frequency and the commingling of funds among the Freight Bill Payment Account and the various Intended Customer FBO accounts (including at times among the FBO accounts themselves) is evidence of and reflects the Insiders' continuing shuffling of deposits, at least in large measure, to hide their embezzlements and use of Customer Deposits for personal gain. There is little question, for example, that the Insiders, aided by Klayer and others, were "stalling" Alcoa's representatives regarding their complaints.[7] *See supra* ¶¶ 51-52.

---

[7] On September 29, 2016, Alcoa Inc. announced that its Board of Directors had approved the completion of the Company's separation into two independent, publicly traded companies. Arconic focuses on providing high-performance materials and engineered products to the aerospace, automotive and other growth industries, positioned for profitable growth. Alcoa Corporation would focus on bauxite, alumina and aluminum products. The separation became on November 1, 2016.

d.  As demonstrated in the examples set forth in Exhibit B, the expansion of the Overdraft shell game the Insiders were engaged in reached its peak in 2018.  For example, in the Alcoa accounts alone (accounts ending in 0348 and 7220) a total of $12,844,000.00 was transferred into the Freight Bill Payment Account from the Alcoa accounts in 2018 and only $7,568,000.00 was returned to those accounts.

34.     The cold numbers in the examples set forth in Exhibit B evidence the pattern and practice of moving money from the Intended Customer FBO Accounts to the Freight Bill Payment Account.  This pattern and practice is further evidenced by the contemporaneous communications of the relevant individuals and entities, including BOA employees, accountants, lawyers, Ms. Peterson, and the Insiders, and show a clear picture of the embezzlements and the manipulation of the BOA accounts to cover the resulting Overdrafts, with BOA's substantial assistance, facilitation and active involvement and knowledge.

## IV.    THE "BLACK HOLE:" THE MISAPPROPRIATION OF CUSTOMER DEPOSITS.

35.     On or about January 29, 2004 and continuing through and including the Petition Date, Debtor's counsel, Cobb Cole and its partner John Ferguson ("**Ferguson**") also had actual knowledge of, or willful blindness to, the fact that the Insiders had engaged in a pattern and practice of using Customer Deposits, which were intended to be, and should have been, used exclusively to pay each respective customer's vendor obligations, in several instances to fund personal loans to Insiders.

36.     Cobb Cole and Ferguson knew of the defalcation of Customer Deposits by the Insiders at least as early as February 2, 2004. *See* Ferguson's Memorandum to Defendants under date of February 2, 2004. (the **Internal 2004 Memorandum**").  (Annexed hereto as Exhibit C). In the Internal 2004 memorandum, Ferguson lays out his actual knowledge that his client, IPS, had "used the funds in its accounts that were deposited by its customers for payment of the customers' direct expenses for the capitalization of the company's operation and for the funding of personal

loans to the owners." [Exhibit C at 1]. Ferguson describes learning that IPS was "about" breaking even at that time, but that Davies had begun using the principal (as opposed to merely interest) of the Customer Deposits when IPS had a short fall in operating cash and could not cover operating expenses. *Id.* at 2. Ferguson confirmed that there had been, to that point, approximately $2,500,000.00 in "loans" to the Insiders during the same time as shortfalls in IPS's operating funds. Davies' explanation to Ferguson was that the Insider loans were made to "pay-off their own personal mortgages and then agreed to pay-back the Company at a rate of interest that was substantially higher than the Company was getting elsewhere." *Id.* Davies claimed, ignoring the obvious self-benefit to the Insiders and detriment to IPS, that the Insider mortgage pay-off loans were designed to generate income for the Company from the higher rates of interest. *Id.* That, of course, would have assumed that the Insiders had all paid off the loans or had not resorted to using IPS as a means of obtaining personal funds with absolutely no benefit to the Debtor. As of the Petition Date, at least $6,700,000.00 in Insider loans and transfers had been made by the Debtor,[8] including, but not limited to, the following:

a. Between May 2013 and the Petition Date, the Debtor made direct loans to the Freight Rate Company, LLC (f/k/a Macrotransport Services, LLC), as well as payment of professional fees on its behalf. The Examiner determined that as of March 6, 2019, the Debtor was owed $1,703,124.12. [ECF No. 182 at 27]. [ECF No. 182 at 27]. Davies confirmed the amount owed. Klayer told the Examiner that "Freight Rate has trouble making payroll and paying rent and often relies on loans from Debtor to keep the company operating." *Id.*

b. In or about January 2016, Debtor funded $1,055,796.85 of a Line of Credit from DACACO to Exfreight of Florida, LLC that was thereafter disbursed to Exfreight Zeta, Inc. Debtor also made professional fee payments on behalf of Exfreight of Florida. The Examiner determined that as of March 6, 2019, the Debtor was owed $1,147,226.47 by Exfreight of Florida, LLC. [ECF No 182 at 28-29]. This line of

---

[8] For example, loans and transfers funded at least in part from Customer Deposits were made to the following Insiders and their affiliated entities, including but not limited to, Davies, Casey, Cook, McNett, The Freight Rate Company, LLC (f/k/a Macrotransport Services, LLC), Exfreight Zeta, Inc. and Exfreight of Florida. None of these loans provided any benefit to the Debtor.

credit was funded in large measure by a January 26, 2016 transfer of $905,796.85 from the BOA Freight Bill Payment Account.

c.  In or about January 2011, Debtor loaned LJ McNett $350,361.69 at an annual interest rate of 3.25% for the purchase of a residential property.  As of March 6, 2019, LJ McNett owed the Debtor $273,577.73 on this loan.  [ECF No. 182 at 29].[9]

d.  On or about August 15, 2016, Davies and his spouse sold a parcel of vacant land in Flagler Beach, Florida, to Debtor for $375,000.00.  The purpose of the sale was to generate cash for Davies.  Debtor paid $10,068.44 in property taxes on the parcel between 2017 and 2018.  Debtor sold the property on January 25, 2019 for net proceeds for $315,765.09.  The transaction to provide Davies with funds resulted in a net loss to Debtor for $69,303.35. [ECF No. 182 at 30].

e.  Additional instances reveal commingling of Customer Deposits in Intended Customer FBO Accounts.  For example as evidenced in the diagram below and in Exhibit B, funds were transferred between and among Intended Customer FBO Accounts in order to pay vendors of one customer (Atkore in this example) with funds in another customer's Intended Customer FBO Account (Rexnord in this example).



[ECF No. 182 at 33].

37.  On November 12, 2008, Ferguson wrote to Davies concerning deficits in Customer Deposits.  (the "**November 12, 2008 Email**").  (Annexed hereto as Exhibit D).

---

[9] This Insider loan has been paid off in full with interest on January 29, 2020/

38.     Ferguson presents his version of a historical perspective and advice regarding the issue.  First, Ferguson acknowledges that the reorganization of Debtor into an entity held one hundred percent (100%) by DACACO in 2003 was prompted by the defalcation of Customer Deposits.  [Exhibit D at 1].  "In essence, IPS was borrowing the customer's (sic) deposits, which should have been held in constructive trusts for the customers, without the customer's (sic) consent."  [Exhibit D at 1].  Ferguson goes on to acknowledge that the advice that he and Cobb Cole had provided Debtor was not the "best scenario" but it was necessary because Debtor "did not have the cash or credit facility available to repay all of the customers if the customers demanded return of the deposits."  [Exhibit D at 1].  By the time of the November 12, 2008 Email, the Debtor's Insiders had misappropriated some $9 million of Customer Deposits.

39.     The defalcation—the so called "black hole"—was not being paid down.  Debtor's liabilities to its customers and its exposure were not decreasing, they were growing.  "When I got a copy of the financial statement, I saw that the (sic) not only was the $9M blackhole not paid down, it had **significantly increased**.  I'm not an accountant so I don't know if my reading is accurate or not.  The 'blackhole' is the amount of the difference between the amount of customers (sic) deposits that IPS is supposed to have and the amount of customer deposits that IPS actually has."  [Exhibit D at 1].

## V.     BOA'S CONTEMPORANEOUS COMMUNICATIONS REGARDING OVERDRAFTS

40.     The Trustee's investigation has revealed that Debtor's internal accounting staff, and in particular Ms. Peterson, was in regular communication with banking professionals at BOA regarding many aspects of Debtor's accounts, including how to address Overdrafts.  According to evidence developed during the course of the Trustee's investigation, Karen Jacobs ("**Ms. Jacobs**") was Debtor's primary point of contact for its relationship with BOA from 2004 through in or about

March 2018.  At all times relevant Ms. Jacobs was the Client Manager for Debtor's relationship with BOA and held positions as a Vice President or Senior Vice President of BOA during the course of her relationship with Debtor as its Client Manager.

41.   Ms. Jacobs was examined pursuant to Rule 2004 on June 16, 2021 via Zoom.[10] While Ms. Jacobs recalled few specifics of her fourteen year tenure as BOA's Client Manager over Debtor's accounts and banking relationship, she did recall the following facts, among others

a.   Ms. Jacobs was supported in her role as Client manager by other BOA employees including, Ms. Angel Hayes ("**Ms. Hayes**") and Ms. Nancy Mujic ("**Ms. Mujic**"). Ms. Mujic was Ms. Jacobs equal in terms of rank at BOA and worked as a Treasury Officer.  Ms. Hayes dealt with day-to-day support and communication with Debtor relating to its accounts at BOA.

b.   Ms. Jacobs was responsible for the overall management of BOA's relationship with Debtor, including foreign accounts, although Ms. Jacobs indicated that she had no access to the records of such foreign accounts and professed to be unaware of what transpired in relation to such accounts.

c.   BOA's primary points of contact with the Debtor for day-to-day operational matters was Ms. Peterson.  BOA also dealt with Davies and with McNett.

d.   Ms. Jacobs and her team conducted regular reviews with Debtor of its business in order to assess and address its needs from a banking perspective.  BOA was aware that Debtor's business included offering to its clients a service by which Debtor would take over payment of its Customer's freight vendors, that is, Debtor would provide third party payment services to such Customers.  Ms. Jacobs was aware that where BOA accounts had names in addition to that of Debtor that those names were those of specific Customers of Debtor.

e.   Ms. Jacobs was familiar with the Freight Bill Payment Account.  Ms. Jacobs understood that the term FBO means that an account was "for the benefit" of the additional person or entity named on the account.

f.   Debtor had Overdrafts in its accounts, and in particular in the Freight Bill Payment Account, from at least 2008 forward.  *See also* Composite Exhibit E annexed hereto.[11]  The Overdrafts were a concern to BOA.  By October 30, 2018, after Ms.

---

[10] The transcript of Ms. Jacobs' examination is not available as of this writing.  The Trustee bases his recitation of her testimony on collective notes, recollections and a "rough" transcript of the examination and bases these summaries in good faith upon information and belief.

[11] Composite Exhibit E consists of selected examples of contemporaneous emails from BOA to Debtor or to other BOA employees internally regarding the Overdrafts.

Jacobs had transitioned to another post within BOA, the Overdrafts had become a daily occurrence.

g.  Insider McNett explored obtaining a Line of Credit with BOA in 2011 as a means of addressing the Overdrafts.  Ms. Jacobs advised him that cash management (which is to have sufficient funds on hand to cover checks written) was the solution and not credit.

h.  Ms. Jacobs recalled that BOA put several "Treasury" programs in place to resolve the Overdrafts in the IPS accounts.  Ms. Jacobs could not recall what the programs were except that one dealt with cash disbursements.  Ms. Jacobs does not know when the Overdrafts "stopped."[12]

i.  Ms. Jacobs recalls being in direct contact with one of Debtors' client representatives, Mr. Chuck Gianci from Covidien, regarding a Letter of Credit ("**LOC**") required by Covidien in its favor from Debtor.  In essence, one of Debtor's customers required Debtor to provide a LOC (ultimately in the about of $4,000,000.00) in order to secure Debtor's performance of its obligations as a third party payor.  Ms. Jacobs professes no recollection of any of the particulars of the communications in 2013 and 2014, but acknowledged that it was tied to Debtor's contractual obligations to Covidien.  Ms. Jacobs does recall that this LOC took longer than other instances in which she was involved and that typically such a LOC did not take too long.  Ms. Jacobs also denied having assisted McNett in "delaying" the LOC and noted some frustration with dealing with McNett.

j.  In 2017, Ms. Jacobs authored, with Ms. Hayes, a BOA Credit Request Form relating to Debtor.  In the area provided for assessment of opportunities or challenges, no mention is made of the pattern and practice of Overdrafts that at that point had been ongoing and increasing for more than nine years.  Instead, it is suggested that Debtor had "strong depository balances."  Annexed hereto as Exhibit F.

k.  Ms. Jacobs' transitioned her position as Client Manager of Debtor's relationship with BOA in March 2018 to David Suellau ("**Mr. Suellau**").  Mr. Suellau was voicing concerns of the daily Overdrafts in the Freight Bill Payment Account at least as early as October 2018.

42.    There is no question that the Overdrafts were significant from 2008 forward and that BOA had actual knowledge of them, and their significance, from 2008 forward until the

---

[12] In fact and as evidenced by Exhibit B as well as contemporaneous writings in Composite Exhibit E, the Overdrafts did not stop, but instead became even more chronic as time progressed.  What is abundantly clear is that whatever measures BOA took regarding the Overdrafts were wholly unsuccessfully and the practice went on unimpeded.

Petition Date.  In addition to the factual recollections of Ms. Jacobs as summarized above and the referenced exhibits, there is confirmation of five months of Overdrafts in the Freight Bill Payment Account in early 2015 resulting in a refund of $65,380.00 in overdraft fees by BOA to IPS.  *See* Composite Exhibit G annexed hereto.  While Ms. Jacobs could not recall the precise amount of fees charged to BOA customers for overdrafts or items returned owing to insufficiency of funds ("**NSF**"), she agreed that $65,380.00 in charges over a five-month period was "large."

43.     Ms. Peterson confirms that BOA had knowledge of the Overdrafts in the Freight Bill Payment Account and of the movement of funds from Intended Customer FBO accounts to cover the Overdrafts.  Ms. Peterson confirms that the transfers were always undertaken and that Ms. Jacobs and Ms. Hayes, in particular, would contact her regularly regarding the Overdrafts.  In addition to contact by electronic mail, as in the examples contained in Composite Exhibit E, BOA personnel would also regularly contact Ms. Peterson by phone.  Ms. Peterson recalls that BOA personnel would advise her that there was an Overdraft in the Freight Bill Payment Account and would advise what other accounts, that is the Intended Customer FBO Accounts, had sufficient funds that could be used to cover the Overdrafts.  Ms. Peterson confirmed that the Overdrafts were not isolated occurrences but rather that they grew as time wore on eventually becoming an almost daily event in the months prior to Ms. Peterson's resignation from IPS in late 2018.

44.     BOA's internal records, in addition to other communications cited herein, confirm that BOA had knowledge that the Intended Customer FBO Accounts as well as other accounts, including the Freight Bill Payment Account, were to be used to pay Debtors' Customers' freight vendors.  Putting aside the plain meaning of the title of the accounts, and BOA's knowledge of the Debtor's business from its regular reviews and audits, Davies expressly confirmed that purpose in a 2016 BOA Authorization and Agreement for International Accounts noting, "[a]ll accounts are

setup to pay freight charges to carriers on behalf of our clients." *See* Exhibit H annexed hereto at 3. Notably included in the accounts specifically listed by Davies were the Freight Payment Account and the Alcoa and Mueller FBO accounts, each of which play prominent roles in the Overdrafts summarized in Exhibit B.  Ex. H at 2a.

45.     In addition to assisting, enabling and facilitating the Insiders' ability to continue their embezzlements and to cover them up by playing a shell game with the Intended Customer FBO Accounts, BOA's actions, or lack thereof, enabled the Insiders and their lawyers and accountants to actively conceal and frustrate customers' attempts to discover what was taking place and to effectively and substantially assist the Insiders in a cover up and breach of their fiduciary duties to IPS.

## VI.     DEBTOR'S CUSTOMERS' COMPLAINTS

46.     In time, IPS's customers began to lodge complaints based in part on IPS's failures to fulfill its obligations, including under the Services Agreements, to, among other things, make timely payments on behalf of its customers to their vendor freight companies and to properly credit or issue refunds to its customers.  These inquiries would eventually lead to the discovery of the Insiders' self-interested acts.  That discovery would have occurred much sooner if BOA had not substantially assisted the Insiders' in covering up their embezzlements through the Overdrafts.

47.     Among the many professional services undertaken by MKA and Klayer and Associates was the task of reconciling all of Debtor's bank accounts, including the BOA accounts. Klayer confirmed in communications to the Examiner that he was responsible for doing bank reconciliations for Debtor.

48.     Among the customers who voiced complaints was Alcoa who, as discussed above, was named on two Intended Customer FBO Accounts at BOA.

49.     While Klayer was responsible for providing monthly reconciliations on the Alcoa account to Alcoa representatives, he routinely failed to provide timely reconciliations.

50.     As early as July 6, 2017, Klayer was to send Alcoa the prior month's reconciliations on the two Alcoa Intended Customer FBO Accounts.  In an email to Davies, Klayer advised Davies that he had "stalled" sending the reconciliations because he "wanted to talk to you about the activity in the accounts to make sure it want (sic) cause any other issues."  (the "**July 6, 2017 Stalling email**" annexed hereto as Exhibit I).

51.     The problem with the Alcoa reconciliations continued.  On August 1, 2017, Klayer sent an email to Ms. Peterson regarding an ongoing issue that Debtor's customer Alcoa was voicing about timely payment of its providers' invoices.  [Annexed hero as Exhibit J, the "**August 1, 2017 email**"].  By the time of the August 1, 2017 email, Alcoa had pressed Debtor for regular reconciliation of its Customer Deposits.  Klayer noted that the Customer Deposits in BOA Alcoa FBO Account were not being properly handled.  ["If alcoa (sic) was included in that report and alcoa only deposit (sic) money in their standalone account it would mean we are taking too much of the freight account and we should be sweeping the alcoa (sic) accounts on a weekly basis to recognize our fees that are deposited to each alcoa (sic) account and replace that money to the freight account." [Exhibit J].  Also apparent from the August 1, 2017 email is the fact that Klayer had no apparent understanding of the specific details of how his client was handling this designated account (in spite of having had past involvement in dealing with Alcoa complaints) and that only the increased pressure from Alcoa for detailed explanations had prompted a more detailed inquiry on his part following up on his earlier emails to Davies.  ["I need to definitively know about this process as now there is so much visibility on these four accounts with the client that when we have

arrive (sic) in June the reconciliations are producing an overdrawn account balance and that is a red flag for sure so I will need to be able to explain this all ...." *See* Exhibit J.]

52.     Eventually, the Trustee reached settlements with many of the customers who had Intended Customer FBO accounts at BOA. [ECF No. 437].   Included among that number was Alcoa. [13]   The Court approved the settlement as to Alcoa.   [ECF No. 466].   Thereafter Alcoa amended its claim, resulting in an outstanding claim against the estate of $10,080.24.   [ECF No. 46-1].   Alcoa was one of the lucky ones.   The aggregate allowed claims after settlement for the remaining creditors is in excess of $65 million dollars.

53.     For example, Stanley Black Decker ("**SBD**") had been using Debtor as SBD's freight payment processor since 2011 pursuant to a Services Agreement that was amended on December 16, 2013 (Annexed hereto as Exhibit K) and February 1, 2018 (Annexed hereto as Exhibit L).   By December 2018, SBD became aware that the Debtor was not timely paying SBD's vendors' invoices even though full Customer Deposits had been made by SBD.   [ECF No. 15 at 7].   SBD had a standalone Intended Customer FBO Account at BOA ending in 6533.   After several stalled attempts to find the underlying cause of the issue with Debtor's Insiders, SBD issued a default notice to the Debtor on January 18, 2019.   [ECF No. 15 at 8].   As part of the default procedure, SBD announced its intention to appear at Debtor's offices in Ormond Beach, Florida to conduct an onsite audit.   [ECF No. 15 at 8].

54.     By at least January 20, 2019, Cobb Cole and Ferguson were aware of the SBD default notice and the audit demand.   In a series of emails on January 20, 2019 (the "**SBD Email Chain**") (Annexed hereto as Exhibit M), Cobb Cole and Ferguson become actively involved with

---

[13] Case 6:19-bk-00511-KSJ Claim No. 46-1 and 46-2.

Insiders Davies and McNett in hindering SBD's investigation and audit, and in delaying SBD's attempts to recoup its defalcated Customer Deposits.

55.    Among Ferguson's initial proposed responses to SBD's audit demand, Ferguson suggested offering up the recent departure of Ms. Peterson as an excuse for why the audit could not proceed as demanded.  [Exhibit M at 4].

56.    Ferguson acknowledged that when SBD conducts the audit "I assume that they will learn that IPS does not have the funds that Stanley (SBD) provided to IPS to pay Stanley's carriers. Do you know yet what the deficiency is?" [Exhibit M at 2].  "The size of the deficiency is less than $11M, right?  …you will have to simply say that with your and Nancy's health issues and Brandy's departure you can't talk specifics but you will be prepared to do so when you meet.  If the amount is $11M or more, then the amount of the deficiency has materially grown over the years rather than steadily decreasing, and I need to get you in touch with a bankruptcy attorney tomorrow for the company and personal criminal defense attorneys tomorrow before you agree to let them do the audit …." [Exhibit M at  2-3].  In fact, SBD alone has an amended proof of claim in excess of $52 million in the bankruptcy estate, including interest, fees and expenses [ECF No. 45], more than $41 million of which is attributed to the failure to pay SBD vendor payments.[14] [ECF No. 15 at 2, fn. 2].

57.    In fact, Ferguson proceeded to mislead SBD representatives in order to delay the audit.  Specifically, Ferguson wrote to SBD on January 22, 2019 and unilaterally canceled the audit on Debtor's behalf. (the "**SBD Letter**") (Annexed hereto as Exhibit N). Instead of simply canceling the audit, Ferguson affirmatively mislead SBD about the reasons for the cancellation: first, that Peterson's departure has some unspecified impact; second, that the Debtor is unable to

---

[14] As with Alcoa, SBD recouped some of its original claim after the approved settlements.  [ECF Nos. 437 and 466].

access all information related to Stanley; and third, that the Debtor cannot protect the information of other customers in an audit, and thus that Debtor was conducting its own audit and would provide the results to SBD.

58.     During the course of its relationship with Debtor, BOA regularly requested and received financial statements from Debtor.  For example, on April 27, 2012 BOA forwarded a letter to McNett requesting certain financial statements and reports.  Annexed hereto as Exhibit O. The reports were requested in connection with Debtor's accounts it's Treasure Management services.  The request was written on behalf of Ms. Jacobs and she was copied on the letter.  McNett finally provided the information on May 14, 2012.  Annexed hereto as Exhibit P.  McNett attached Debtor's Balance Sheet and Income Statement as of December 31, 2011.  The attached balance sheet clearly reflect amounts due from some of the Affiliates and the Consolidated Balance Sheet reflects Loans relating to the Macrotransport Building as well as notes receivable from the Insiders with a combined value in excess of $9,500,000.00.  *Id.*  Finally, to the extent there could be any doubt on the part of BOA on what should have been taking place with the Customer Deposits, a review of the SOC Report on Controls (SOC 1 Report) for November 2010 through October 2011 made abundantly and expressly clear that Debtor was to use the received Customer Deposits to pay the customers' vendors.  Exhibit P at attachment 3, page 16.

59.     The above referenced examples and evidence demonstrate that BOA had actual knowledge of  chronic Overdrafts in the accounts earmarked to be used to pay Customers freight vendors generally, ie. the Freight Bill Payment Account, or accounts specifically earmarked for specific customers, including but not limited to Alcoa, SBD and Mueller. BOA had actual knowledge of the condition of the Debtor from its annual financial statements, including the above referenced loans as well as affiliate transfers, neither of which provided a benefit to the Debtor.

23

BOA's active and decade long facilitation and substantial assistance therefore enabled the Insiders not only to continue their embezzlements for their personal gain and to no benefit to the Debtor, but additionally enabled them to conceal and actively hinder the discovery of such embezzlements, all to Debtor's detriment and without benefit to it.   At a minimum and alternatively, BOA was willfully blind to the chronic Overdrafts and above referenced facts resulting in the same facilitation and substantial assistance to Debtors' Insiders.

## COUNT I
### Aiding and Abetting Breach of Fiduciary Duty

60.     The Trustee re-alleges paragraphs 1 through 59 as if set forth herein.

61.     As actual and/or *de facto* officers, directors, managers and controlling persons of the Debtor, the Insiders, that is, Davies, Casey, Cook, McNett and LJ McNett, each owed fiduciary duties to the Debtor, including without limitation, a duty of due care, a duty of loyalty and a duty to act in the Debtor's best interests.

62.     The Insiders were required to carry out these duties in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

63.     BOA had actual knowledge that the Insiders were among Debtor's actual and/or *de facto* officers, directors, managers and control persons and that each owed fiduciary duties to the Debtor.

64.     The Insiders breached these fiduciary duties as set forth and detailed above.

65.     BOA had actual knowledge of the Insiders' breaches of their respective fiduciary duties to the Debtor as set forth and detailed above.

66.     BOA was willfully blind as to the Insiders' breaches of their respective fiduciary duties to the Debtor as set forth and detailed above.

67.     BOA knowingly and substantially assisted, enabled and facilitated the Insiders breaches of their fiduciary duties to the Debtor and facilitated and enabled the Insiders in the conduct of fraudulent banking activity, and by failing to adhere to international, federal, local and internal regulatory banking procedures and policies, aided and abetted the Insiders commission of breaches of fiduciary duty over the course of several years leading to the Petition Date.

68.     BOA substantially assisted the Insiders' breaches of their fiduciary duties to the Debtor through its willful blindness and facilitated and enabled the Insiders in the conduct of fraudulent banking activity, and by failing to adhere to international, federal, local and internal regulatory banking procedures and policies, aided and abetted the Insiders commission of breaches of fiduciary duty over the course of at least ten (10) years prior to the Petition Date.

69.     The Insiders' breaches of their fiduciary duties to the Debtor caused the Debtor millions of dollars in damages, including because (i) the continued defalcation by the Insiders of the Customer Deposits increased the Debtor's insolvency by adding to the "black hole," (ii) the Debtor incurred substantial additional exposure on such sums in the way of interest, damages and expenses claimed by affected customers, (iii) the Insiders continued in their practice of making Insider and inter-company loans and transfers, including to the Insiders and the inter-company loans and affiliate transfers, (iv) the Insiders' concealment of the continued defalcations and embezzlement assisted and facilitated by BOA, among others, and (v) the failure to collect on defaulted Insider loans, inter-company loans and affiliate transfers which were not in the Debtor's best interest thereby causing the Debtor to fall into even deeper insolvency, all to the detriment of the Debtor.

WHEREFORE, the Trustee demands the entry of judgment against BOA for compensatory damages, consequential damages, special damages and punitive damages resulting from its aiding

and abetting the Insiders' breaches of their fiduciary duties, including but not limited to: (i) the decrease in the value of the Debtor's assets and enterprise value; (ii) the loss and depletion of material assets of the Debtor; (iii) the increase in the Debtor's liabilities; (iv) the Debtor's deepening and increased insolvency as evidenced by, *inter alia*, the claims register maintained by the Clerk of the Court; (v) corporate waste; (vi) the loss of business opportunities; (vii) administrative fees and expenses incurred by the Debtor's estate during the Bankruptcy Case; and (vii) other damages as may be ascertained through discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

The Trustee hereby (i) demands a trial by jury on all claims and issues triable in this Complaint, and (ii) requests in regard to such demand that the reference to the Bankruptcy Court not be withdrawn, if at all, unless and until all discovery and all pre-trial motions and matters, including dispositive motions, are disposed of and otherwise adjudicated by the Bankruptcy Court. The Trustee specifically consents to a jury trial before the Bankruptcy Court and to the entry of final judgment by the Bankruptcy Court.

Dated: June 26, 2021

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Special Litigation Counsel for*
*Trustee, Alex D. Moglia*
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310


/s/   Paul J. Battista, Esq.
     Paul J. Battista, Esquire
       Florida Bar No. 884162
       pbattista@gjb-law.com
       Theresa Van Vliet, Esquire
        Florida Bar No. 374040

26

tvanvliet@gjb-law.com
John K. Olson, Esquire
Florida Bar No. 201634
jolson@gjb-law.com